IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

GREEN PARTY OF ARKANSAS,
JIM LENDELL and MARK SWANEY                                              PLAINTIFFS

v.                             No. 4:06CV00758 GH

CHARLIE DANIELS, in his official capacity as
Secretary of State of the State of Arkansas                              DEFENDANT

## MEMORANDUM OPINION AND ORDER

On the afternoon of August 17th, the Court held a hearing on plaintiffs' June 27th motion for preliminary injunction which was merged with the trial on the merits pursuant to Civil Procedure Rule 65(a)(2).[1] The Court denied defendant's August 13th motion in limine to exclude the testimony of Richard Winger and Swaney. After hearing the testimony of those two witnesses and then argument of counsel, the Court took the matter under submission and announced that a written decision would be filed by August 24th.

## FINDINGS OF FACT

On July 30th, the parties filed the following joint stipulation of facts:

1.  This action is brought under 42 U.S.C. § 1983 seeking declaratory and injunctive relief requiring the defendant to certify the Green Party of Arkansas as a recognized political party. At issue in this case is the discrepancy between the number of signatures (24,171) required

---

[1] Counsel for the parties agreed at the hearing/trial that merger was proper. Defendant had responded to the motion for preliminary injunction on August 4th and plaintiff had filed a reply on August 11th, also pursuant to agreement of counsel.

      to certify a new political party under Ark. Code Ann. § 7-7-205 and the number of signatures (10,000) required to recognize an independent candidate under Ark. Code Ann. § 7-7-103.

2. Certification gives a political party access to the ballot. Ark. Code Ann. §§ 7-7-101 & -102. It also gives the party's nominees an accurate and informative party label once on the ballot. Arkansas law requires that ballots include a party designation for candidates affiliated with recognized political parties but requires that all other candidates, regardless of their actual political affiliation, be labeled as "Independent." Ark. Code Ann. § 7-5-208(g)(5). There is no way other than official recognition for a party's candidate to be listed on the ballot with an accurate and informative party label.

3. Once certified under Arkansas state law, a new political party may run a slate of candidates for the first election after certification. Ark. Code Ann. § 7-7-205(g)(2). If the new political party obtains 3% of the total vote cast for the office of Governor or presidential electors at the first election after certification, the new political party can continue to nominate candidates. Ark. Code Ann. § 7-7-205(g)(4). An independent candidate is allowed a place on the ballot for a single race once the candidate meets the signature requirements for certification. Ark. Code Ann. § 7-7-103(b)(1)(B).

4. The state of Arkansas uses an "office-group" ballot, which lists all the names of candidates for a particular office in a perpendicular column under the name of the office to be filled. Ark. Code Ann. § 7-5-208(g)(1). The alternative is a "party-column" ballot, which lists all candidates from a political party together in one column or row.

5. Arkansas adopted the 10,000-signature petition requirement for independent candidates in 1977. Since then, two state-wide candidates have successfully obtained ballot access by

        submitting the requisite number of signatures: John Black for U.S. Senator in 1978 and Rod Bryan for Governor in the current general election.

6. Arkansas adopted the 3% petition requirement for new political parties in 1977. Since then, one party has obtained ballot access by submitting the requisite number of signatures: the Reform Party, which was certified in 1996 after a petition drive employing paid petition gatherers.

7. A new political party may nominate candidates by convention for the first year after certification as a new political party. Ark. Code Ann. § 7-7-205(g)(2). On July 15, 2006, the Green Party held a convention and named Plaintiff Jim Lendall as the Green Party's nominee for Governor in 2006. Other persons are interested in running as Green Party candidates, and their decision as to whether to seek the nomination of the Green Party may depend on whether the Secretary of State will be required to recognize Green Party candidates.

8. Unless the Green Party of Arkansas is officially recognized as a political party in the State of Arkansas, neither plaintiff Lendall nor any other Green Party nominees will appear on the ballot as Green Party candidates in the 2006 General Election.

In addition to the above stipulated facts, the Court makes the following findings of fact:

9. Swaney is the coordinator of the executive committee for the Green Party of Arkansas and coordinated its ballot access effort. He testified about the two separate petition drives to collect signatures on petitions to submit to the Secretary of State and the difficulty in gathering signatures due to the shrinking of public space, the amount of time needed, the fact that most of the volunteers work so that they generally have one day a week to collect

signatures, problems with inclement weather, the expense in engaging paid petitioners who also take days off, the requirements concerning notarization and same-county petitions, the language of the petitions, and the geography of Arkansas.

10. Swaney estimated, based on his experience with petition gathering, that close to 40,000 of raw, unchecked signatures would be needed to be reasonably assured of collecting the minimum number required – 24,171 – in order to become recognized as an official political party in Arkansas and that goal would not be achievable for a party like the Green Party. He explained that, given the validation rate that they were able to find by spot-checking their own signatures, that at least 18,000 signatures were needed to be certain that a 10,000 total valid signatures would be achieved as well as a safety margin above that 10,000 figure and that, while they were able to gather the 18,000 signatures, it was not easy to accomplish.

11. Although Swaney conceded that plaintiffs concluded the last petition drive in approximately 120 days when they were permitted 150 days to collect petitions, he stated that they had achieved their original goal of 18,000 signatures, that they had tried to collect as many signatures as quickly as possible and knew that there was not a chance they would be able to meet the three percent rule, that they did not have the financial resources to collect further petitions at that point without totally exhausting their resources, and that they knew that time would be needed for court activity so they would be able to have ballot status to be able to campaign before the election in November.

12. Winger publishes a monthly newsletter called the Ballot Access News that covers the developments in the law that affect the ability of minor parties and independent candidates to get on the ballot and campaign, he has published in the field of ballot access and minor

political party activities, and he has been qualified as an expert in federal courts on existing ballot access laws,[2] their history, the usage of those laws, and related information concerning registration into minor political parties.

13. He completed a study in 1997 on ballot access laws and their history in Arkansas.

14. Winger explained that the reasons why a party in Arkansas would want to qualify as an official political party as opposed to running its candidates as independents are that there are voters who want to vote for a particular minor party that they have heard about, but may not know who on the ballot is the nominee of that party so that if the candidates of the minor party qualify with the independent procedure with the label independent, then those voters would not know how to vote; if the Green Party candidate is on the ballot as an independent, but its literature says the candidate is the Green Party's nominee, that confuses the voter; and that it simply dilutes the message if the candidate cannot be identified publicly in all official spheres with the party.

15. The office-grouping ballot is a clearer ballot and saves space. Winger believes that eight candidates for a particular office is not a crowded ballot.

16. Winger disagrees that a three percent signature requirement is necessary to avoid a crowded or cluttered ballot as, in the 30 years since 1977, there have only been two candidates for statewide independent office in Arkansas, that the most crowded presidential ballot in Arkansas since the 1,000 signature petition requirement for candidates for president was passed in 1997 has been seven names, and in the 80 years in Arkansas history when only a

---

[2]Indeed, he testified as an expert in the case of Citizens to Establish a Reform Party v. Priest, 970 F.Supp. 690 (E.D. Ark. 1996), before the undersigned.

nominating convention was held to get on the ballot, there were never more than six parties on the ballot.

17. Arkansas is one of three states that has a mandatory petition for a new party in excess of two percent of the last gubernatorial vote.

18. Arkansas has had the lowest average – 2.06 – of any state of candidates on the November ballot for governor and U.S. senator in the last 25 years.

19. Winger concludes that the three percent petition is not needed to keep the ballots from being crowded.

20. In the previous 80 years, there have been 22 cases when there was a third party on the ballot in Arkansas with an average of two candidates and the most nominees any third party ever had was nine by the American Party in 1970.

21. The most frequent office for which minor parties had candidates was president and the second most frequent office was governor.

22. If the Green Party were to nominate someone for every one of the 117 legislative seats this November, there would be about 82 races with two people on the ballot, about 35 races with three people on the ballot, and maybe one race with four people on the ballot.

23. Winger's research, which was published in the Election Law Journal this past April, shows that, nationwide back to the beginning of government printed ballots in the 1890s, any state that required as many as 5,000 signatures to get on the general election ballot would only have up to eight candidates for a particular office with only two exceptions and then it was just nine candidates.

24. If the law were that 10,000 signatures would be the threshold for a party to be on the ballot, the only other party that would have tried to get on the ballot in Arkansas this year would have been the Libertarian Party.

25. The Court finds that even though plaintiffs had 30 more days in which to obtain signatures, they were reasonably diligent in ending their petition efforts when they did the last of May due to not having financial resources to collect further petitions at that point without totally exhausting their resources, they would not have been able to obtain the number of signatures to reach the three percent requirement during that 30-day period, and they needed to file this lawsuit when they did to obtain a ruling before the ballots are printed for the November election.

## CONCLUSIONS OF LAW

1. This Court has original jurisdiction over this action pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). This suit is authorized by 42 U.S.C. § 1983. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. Venue is proper in the Eastern District of Arkansas pursuant to 28 U.S.C. § 1391(b).

2. A real and actual controversy exists between the parties.

3. The United States Supreme Court in Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), has adopted a special balancing test for evaluating claims against state election laws, all of which inevitably affect the fundamental rights of political parties, candidates and voters:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by

> its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

Under this test, the level of scrutiny varies on a sliding scale with the extent of the asserted injury. When, at the low end of that scale, the law "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, the 'State's important regulatory interests are generally sufficient to justify' the restrictions." Burdick v. Takushi, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (quoting Anderson v. Celebrezze, 460 U.S. at 788, 788-89 n. 9, 103 S.Ct. 1564). But when the law places "severe" burdens on the rights of political parties, candidates or voters, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' " Id. at 434, 112 S.Ct. 2059 (quoting Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)).

4. Arkansas's party recognition scheme burdens "two different, although overlapping kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms." Williams v. Rhodes, 393 U.S. 23, 30-31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). The scheme also burdens the fundamental "right of citizens to create and develop new political parties." Norman v. Reed, 502 U.S. at 288, 112 S.Ct. 698.

5. In addition, the Supreme Court has observed that "the right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So, also, the right to vote is heavily burdened

if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." Williams v. Rhodes, 393 U.S. at 31, 89 S.Ct. at 5.

6. Defendant asserts that the justification for the three percent signature requirement is to show that there is a modicum of support for a political party to be placed on the ballot, that this is a *de minimus* requirement as it amounts to just 1.65 percent of registered voters or, in other words, obtaining 161 signatures a day for 150 days, and that political parties and independent candidates are not similarly situated so that more stringent requirements can be placed on parties than on individual, independent candidates as "[a] new party that gains ballot access by petition could clutter the ballot with hundreds of frivolous candidates who only serve to lengthen and muddle already long ballots." Defendant's Response at p. 10.

7. In Citizens To Establish a Reform Party in Arkansas v. Priest, 970 F.Supp. 690, 699 (E.D. Ark. 1996), this Court stated:

[T]he Supreme Court has recognized that states have an interest in limiting the size of the ballot, avoiding voter confusion, and protecting the integrity of the elections process. Lubin v. Panish, 415 U.S. 709, 714, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702 (1974). These state interests are protected by requiring a certain number of signatures on a petition to demonstrate a modicum of public support. Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). However, if 10,000 signatures are sufficient to demonstrate a modicum of support for an independent candidate (Ark. Code Ann. § 7-7-103(c)(2)), then 10,000 signatures are also sufficient to demonstrate a modicum of support for a new political party, especially where the legislature has also established that a sufficient demonstration of a modicum of support is established in both instances by a 3% signature requirement. Proponents of a new political party in Arkansas must be afforded the corresponding opportunity to submit a finite number of signatures as an alternative to a percentage fixed by statute. Moreover, the finite number of signatures that should be allowed for the creation of a new political party should be the same as the finite number alternative established, by the Arkansas Legislature for an independent candidate, given the common fundamental rights involved in both instances.

8. In the case of <u>Green Party of Arkansas v. Priest</u>, 159 F.Supp.2d 1140, 1142 (E.D. Ark. 2001), this Court concluded in part:

   Under Section 7-7-205(a), a party seeking recognition must file a petition with the Secretary of State containing the signatures of qualified Arkansas voters equal in number to at least three percent of the total number of votes cast for the office of Governor or presidential electors, whichever is less, at the last preceding election; however, the United States District Court for the Eastern District of Arkansas held in <u>Citizens to Establish a Reform Party v. Priest</u>, 970 F.Supp. 690, 699 (E.D. Ark.1996), that the Equal Protection Clause of the Fourteenth Amendment requires that the number of signatures required of new parties seeking recognition be the same as the number (10,000) required of independent candidates seeking ballot access under Section 7-7-103(c)(2) of the Arkansas Code.

9. Arkansas's three percent requirement in its party recognition scheme is not narrowly drawn to serve a compelling state interest. The 10,000 signature threshold is a sufficient modicum of support to serve the state's interest in avoiding cluttered ballots and the evidence shows quite clearly that the three percent requirement is much higher than necessary as it imposes a severe burden under the First and Fourteenth Amendments on the associational rights of the Green Party and the candidates who are plaintiffs in this case because they cannot get on the ballot otherwise.

10. The plaintiffs are suffering irreparable harm as a result of the three percent requirement in Arkansas's party recognition scheme and that the harm will continue unless declared unlawful and enjoined by this Court.

11. The plaintiffs have no adequate remedy at law other than this action for declaratory and injunctive relief.

12. Although plaintiffs did request nominal damages in their complaint, that basis of relief was not mentioned or pursued at the merged hearing/trial. Thus, nominal damages will not be awarded.

Accordingly, it is hereby ordered and declared as follows:

1. The three percent requirement to certify a new political party under Ark. Code Ann. § 7-7-205 violates plaintiffs' associational rights guaranteed by the First and Fourteenth Amendments to the United States Constitution, as enforced by 42 U.S.C. §1983.

2. Defendant, in his official capacity as Secretary of State, is enjoined from failing to recognize the Green Party of Arkansas and he is directed to allow plaintiffs ballot access for the general election this November 2006.

3. The Court hereby awards plaintiffs their costs and reasonable attorney's fees under 42 U.S.C. § 1988.

IT IS SO ORDERED this 23rd day of August, 2006.

_George Howard, Jr._
UNITED STATES DISTRICT JUDGE